UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
Richard LUGO,

                    Petitioner,                                **OPINION AND ORDER**

                                                               **09-cv-00696-NG**
       - v. -
                                                               **FILED**
UNITED STATES of America,                                      IN CLERK'S OFFICE
                                                               U.S. DISTRICT COURT E.D.N.Y.
                    Respondent.                                ★ DEC 1 2 2014 ★

-------------------------------------------------------x       **BROOKLYN OFFICE**
GERSHON, United States District Judge:


       Petitioner Richard Lugo ("Lugo"), *pro se*, moves to vacate his conviction and sentence

under 28 U.S.C. § 2255. On July 26, 2005, following a jury trial, petitioner was convicted of

murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, and use of a

firearm in furtherance of a crime of violence. He was sentenced to a life term of imprisonment,

and his conviction was affirmed by summary order in *United States v. Lugo*, 251 Fed. App'x 695

(2d Cir. 2007), *cert. denied*, 553 U.S. 1047 (2008).

       In support of his habeas petition, Lugo asserts that counsel provided constitutionally

ineffective assistance at various stages of his criminal proceedings. In particular, he claims that

his trial and appellate counsel were ineffective in (a) failing to challenge his indictment,

prosecution, and conviction on aiding and abetting and co-conspirator theories of liability after

the acquittal of Daniel Lugo on the same charges; (b) failing to assert his speedy trial rights; (c)

failing to move to suppress a custodial statement elicited in violation of his Sixth Amendment

right to counsel; (d) failing to move to dismiss the indictment on the ground that he was never

arraigned on the second superseding indictment; (e) failing to file a motion alleging prosecutorial

- 1 -

misconduct; (f) failing to challenge the sufficiency of the evidence; (g) failing to investigate his case; (h) failing to move for a new trial on the ground of newly discovered evidence; (i) failing to challenge his conviction based on a comment by the court at sentencing; (j) the existence of "conflict of interest" between him and his trial counsel; and (k) failing to advise him regarding the government's plea offer and his maximum sentencing exposure. He also claims that his appellate counsel generally provided constitutionally ineffective assistance on appeal. Finally, he claims that his conviction and sentence for possessing a firearm in furtherance of a crime of violence, in violation of 18 U.S.C. § 924(c), should be vacated in light of *Alleyne v. United States*, --- U.S. ----, 133 S. Ct. 2151 (2013).

For the reasons stated below, the court finds that petitioner has not demonstrated any basis for habeas relief and therefore denies the petition in its entirety.

## BACKGROUND

### A.    The Indictments

On August 15, 2001, a grand jury returned an indictment charging Darryl Tyler, Michael McMillan, Kenneth Watson, Dwayne Hunter, Tonya Foster, Daniel Lugo, and Richard Lugo with various crimes, including racketeering, racketeering conspiracy, murder in aid of racketeering, conspiracy to commit murder in aid of racketeering, narcotics conspiracy, and firearms offenses. All of the defendants were arrested in October 2001 with the exception of Richard Lugo, who remained a fugitive until January 2003. Hunter and Foster agreed to plead guilty to the charges against them.

On June 7, 2002, a grand jury returned a superseding indictment against Tyler, McMillan, Watson, Daniel Lugo, and Richard Lugo. This indictment charged Richard and Daniel Lugo with conspiracy to commit murder in aid of racketeering, murder in aid of racketeering, and the use and possession of a firearm in furtherance of a crime of violence.

- 2 -

Richard Lugo was apprehended in January 2003 for using a false driver's license. On November 17, 2003, a grand jury returned a second superseding indictment charging him with conspiracy to commit murder in aid of racketeering, murder in aid of racketeering, and the use and possession of a firearm in furtherance of the aforementioned offenses.

## B.   The Trial of Daniel Lugo, Tyler, McMillan, and Watson

Daniel Lugo, Tyler, McMillan, and Watson were tried before the Hon. Jack B. Weinstein, district judge, in July 2002. The jury found Daniel Lugo guilty of conspiracy to commit murder in aid of racketeering, but he was acquitted of the murder and firearms charges. He was sentenced to the statutorily authorized maximum sentence of ten years' imprisonment. Tyler, McMillan, and Watson also were acquitted of murder, but Tyler and Watson were convicted of conspiracy to commit murder in aid of racketeering, and all three defendants were convicted of racketeering, racketeering conspiracy, and narcotics conspiracy. Tyler, McMillan, and Watson each were sentenced to a life term of imprisonment.

## C.   The Trial of Richard Lugo

Richard Lugo's trial commenced before the undersigned district judge in December 2003.[1] The facts established at trial show:

Beginning in the early 1980s, Tyler (also known as "D-Nice") ran the "D-Nice Enterprise," which distributed large quantities of powder and crack cocaine in New York City. The D-Nice Enterprise later expanded its narcotics business to Baltimore, Maryland. In 1996, Tyler learned that several members of the Enterprise's operations in Baltimore—including Barry Hall ("Little Jus") and Lanny Dillard—had been selling cocaine for their own profit. Tyler

---

[1] Lugo was represented by Peter Fabricant, Esq., from January 28, 2003 to June 19, 2003. Lugo requested a new lawyer on June 19, 2003, and Bobbi Sternheim, Esq., was assigned to be Lugo's counsel. After he was convicted, Lugo was represented at sentencing and in post-trial motions by David Lewis, Esq.

ordered them to stop. On a visit to Baltimore shortly thereafter, Tyler was shot in an apparent assassination attempt.

The D-Nice Enterprise declared war on the now-rival "Little Jus crew." They sought to avenge the attempt on Tyler's life by killing Little Jus, Lanny Dillard, and other members of the rival crew. The ensuing turf war led to several violent confrontations. As a result, Tyler hired gunmen McMillan and Watson to provide security for the Enterprise's operations. In 1998, when Tyler and Erwin Stokes, one of his trusted lieutenants, encountered Dillard, Tyler accused Dillard of attempting to kill him and his brother, Eric Steel ("Tweety"). Less than a month later, on November 16, 1998, Tweety was shot and killed by two unknown assailants.

Believing the Little Jus crew to be responsible, the D-Nice Enterprise hired brothers Richard and Daniel Lugo (the "Lugo brothers") to seek out and kill members of the rival drug operation. On several occasions, Tyler gave Richard Lugo money as a down payment for their services. Eventually, the D-Nice Enterprise learned that members of the Little Jus crew were likely to attend at a party in Manhattan on December 26, 1998. They advised the Lugo brothers. On the night of the party, Tyler, Stokes, and other members of the D-Nice Enterprise met the Lugo brothers at a nearby pool hall. Tyler instructed Hunter, an associate, to search the party for the Little Jus crew, and Hunter called to confirm that Dillard was in attendance. In the early morning hours of December 27, 1998, Dillard was shot and killed as he left the party with his wife and family.

Shortly after Dillard's murder, Tyler, Stokes, and other D-Nice Enterprise members met Daniel Lugo at Junior's Restaurant in Brooklyn and gave him an envelope containing cash. A few days later, Tyler gave the balance of a $30,000 payment to Richard Lugo at another meeting near Junior's. At Tyler's direction, Stokes then delivered two guns to Richard Lugo at Lugo's

- 4 -

apartment. Lugo told Stokes that he could kill other members of the Little Jus crew for an additional $60,000. Stokes later delivered a few ounces of heroin to Lugo. During that meeting, Lugo questioned Stokes about the whereabouts of other members of the Little Jus crew. After Lugo complained to Tyler about the quality of the heroin, Stokes returned to collect the drugs. At this encounter, Lugo sought Stokes's approval to kill another member of the Little Jus crew, but Stokes informed him that only Tyler could give him permission to carry out the hit.

The government's witnesses included four former members and associates of the D-Nice Enterprise who testified pursuant to cooperation agreements. Erwin Stokes, Robert McCall (a drug dealer), and Yakkov Lefkowitz (a drug courier) testified about the Enterprise's narcotics business and the conspiracy to murder members of the Little Jus crew, including the murder of Lanny Dillard. Hunter, the fourth cooperating witness, testified about the plans that led to Dillard's murder. The jury also heard from several eyewitnesses to the events surrounding the shooting, including the victim's wife, and from law enforcement officers who had investigated various aspects of the D-Nice Enterprise's activities.

In addition, Rolando Lorenzo, a convicted prisoner who met Richard Lugo at the Metropolitan Detention Center, testified about several conversations he had with Lugo shortly after Lugo was apprehended. Talking through the air vents, Lugo sought Lorenzo's advice about his case, which he said involved a contract killing. After Lorenzo warned Lugo that "the walls got ears," Lugo sent Lorenzo a letter inside a magazine. The letter, which was introduced at trial, referred to a meeting between Lugo and an "informant" regarding an offer to "rock someone off the piece" in exchange for "10 cent and a car." The letter then asked Lorenzo, "[c]an they use that against a fella?" Because Lorenzo could not read, Lugo had to explain to him that an individual had asked him to "rock," *i.e.*, kill, someone in exchange for $10,000 and a car. Lugo

believed that this individual now was cooperating with the government and wanted to know whether this conversation could be used against him at trial.

The government also introduced a tape-recorded conversation between Richard Lugo and his brother Robert Lugo discussing the letter. During the conversation, Robert informed Richard that the government was seeking a handwriting sample to compare to the letter. Richard agreed with his brother that this posed a serious problem. At trial, a handwriting expert, Peter Tytell, testified that he had obtained handwriting exemplars from Lugo on two occasions to compare to the letter that Lugo had sent to Lorenzo. On the first occasion, Lugo wrote unusually slowly and refused to continue after writing three pages. Tytell testified that the handwriting exemplars he was able to obtain were not in "large measure" Lugo's natural handwriting, but that he nonetheless was able to conclude that there was very strong evidence that Lugo wrote the letter discussing the contract killing.

On January 12, 2004, after a four-week trial, the jury found Lugo guilty of all counts. He was sentenced principally to a life term of imprisonment on the murder charge, a concurrent ten year term on the conspiracy charge, and a consecutive ten year term on the firearms charge.

### D.     Appeal

Lugo appealed his conviction to the Second Circuit. He was initially represented on appeal by Marilyn Reader, Esq., who filed a brief on his behalf. The brief argued that the evidence at trial was insufficient to support his conviction for murder in aid of racketeering and that the court erred in admitting a custodial statement he made to a law enforcement officer. Ms. Reader was then replaced by Uzmah Saghir, who, after missing several court deadlines, ultimately filed a supplemental brief on Lugo's behalf. This supplemental brief argued that venue was improper with respect to the murder in aid of racketeering charge and that Lugo's trial counsel was ineffective for failure to raise a venue challenge. Lugo also submitted a *pro se* brief,

arguing that the court erred in instructing the jury. The Second Circuit considered all of the arguments raised in these briefs and found them to be without merit. *Lugo*, 251 Fed. App'x 695. The Supreme Court denied Lugo's petition for a writ of certiorari on May 12, 2008. *Lugo*, 553 U.S. 1047 (2008).

### E.     Habeas Petition

On February 17, 2009, Lugo filed a habeas petition seeking to vacate his conviction and sentence under 18 U.S.C. § 2255. In the petition and subsequent memorandum of law, he claimed that trial counsel was ineffective for waiving his speedy trial rights without consultation and for failing to move to dismiss the indictment on speedy trial grounds, move to suppress his post-arrest statements, argue that petitioner was never arraigned on the superseding indictment, investigate his case and subpoena witnesses on his behalf, argue that there was insufficient evidence to support his conviction for murder in aid of racketeering, challenge his conviction and sentence based on the court's statement that he was found "not to have discharged a weapon," and pursue a Rule 33 motion for a new trial on the ground of newly discovered evidence. He also claimed that appellate counsel was ineffective for failing to raise several of these arguments on appeal, and for failing to preserve his challenge to erroneous jury instructions.

On May 28, 2009, petitioner filed a supplemental memorandum of law in support of his habeas petition. He alleged that the government committed prosecutorial misconduct by eliciting false testimony and that his right to the effective assistance of counsel was violated because a conflict of interest existed between him and his trial counsel. The government filed a response to the arguments raised in petitioner's original habeas petition and his supplemental memorandum of law on September 25, 2009, and Lugo submitted a reply brief dated October 23, 2009.

On October 29, 2009, petitioner sought to file an addendum to his petition, "clarifying" his arguments regarding prosecutorial misconduct. The government responded to these

additional arguments on December 7, 2009, and petitioner submitted a reply brief. On February 25, 2010, petitioner sought to file a further addendum with respect to his prosecutorial misconduct claim. Then, on June 14, 2011, petitioner requested that the court expand the record to include a letter from the State of New York Grievance Committee for the Second, Eleventh and Thirteenth Judicial Districts concerning the disbarment of one of his appellate attorneys, Uzmah Saghir, and the corresponding opinion and order of disbarment issued by the Appellate Division. The court granted these requests.

On August 14, 2012, petitioner submitted a further affirmation in support of his habeas petition, arguing for the first time that trial counsel was ineffective for not properly advising him regarding the government's plea offer of ten years and misinforming him of the maximum sentencing exposure he faced. Lugo filed another affirmation in support of his petition on May 21, 2013, expanding on his arguments regarding the ineffectiveness of appellate counsel. Petitioner filed yet another affirmation in support of his habeas petition on September 12, 2013, arguing that under *Alleyne*, 133 S. Ct. 2151, the court's determination at sentencing of facts enhancing the mandatory minimum sentence on the firearms charge from five years to ten years violated his Sixth Amendment right to trial by jury. The government responded to the arguments raised in petitioner's supplemental briefs on August 11, 2014.

In response to the government's request that Ms. Sternheim respond to petitioner's allegations of ineffectiveness of trial counsel, Ms. Sternheim submitted a detailed declaration responding to Lugo's allegations that she did not adequately advise him in the plea bargaining process, failed to file a suppression motion on his behalf, and erroneously informed him that the murder charge would be dismissed at trial. Petitioner submitted a reply declaration on September 2, 2014, and replied to the government's opposition brief on October 6, 2014.

**DISCUSSION**

## I.    Standard of Review

A prisoner held in federal custody may "move the court which imposed the sentence to vacate, set aside, or correct the sentence" on the basis that the sentence was "imposed in violation of the Constitution or laws of the United States." 28 U.S.C. § 2255(a). However, "[b]ecause collateral challenges are in tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction" through a habeas challenge than by direct appeal. *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (internal quotation marks omitted).

In ruling on a section 2555 motion, the district court must hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the petitioner is entitled to no relief." 28 U.S.C. § 2255(b). To be entitled to a hearing with respect to claims of ineffective assistance of counsel, petitioner "need establish only that he has a 'plausible' claim of ineffective assistance of counsel, not that he will necessarily succeed on the claim." *Puglisi v. United States*, 586 F.3d 209, 213 (2d Cir. 2009) (internal quotation marks omitted).

Although the court must "view[] the evidentiary proffers, where credible, and the record in the light most favorable to the petitioner," the court "need not assume the credibility of factual assertions . . . where the assertions are contradicted by the record in the underlying proceeding." *Id.* at 214. Moreover, "when the judge that tried the underlying proceedings also presides over the Section 2255 motion, a less-than full-fledged evidentiary hearing may permissibly dispose of claims where the credibility assessment would inevitably be adverse to the petitioner." *Id.* In particular, where petitioner offers only generic or unsubstantiated assertions of ineffective assistance of counsel, the court "may properly rely on his or her knowledge of the record and may permissibly forgo a full hearing and instead request letters, documentary evidence, and

- 9 -

affidavits to aid in its resolution of the claim." *Id.* at 215. If these submissions show "that the particular petitioner had no chance of overcoming counsel's detailed explanation," a full-fledged evidentiary hearing is not required. *Id.*

Finally, because petitioner is appearing *pro se*, the court construes his habeas petition liberally and interprets it to raise the strongest arguments that it suggests. *See Erickson v. Pardus*, 551 U.S. 89, 84 (2007); *Green v. United States*, 260 F.3d 78, 83 (2d Cir. 2001).

## II.    Petitioner's Claims of Ineffective Assistance of Counsel

The Sixth Amendment guarantees the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). To succeed on a claim of ineffective assistance of counsel, a petitioner must "show that counsel's representation fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Id.* at 687-88. An attorney's performance is constitutionally deficient if "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Judicial review of counsel's performance is "highly deferential," and courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. A petitioner can show the required prejudice only if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

A failure to prove either deficient performance or prejudice will defeat an ineffectiveness of counsel claim. Accordingly, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697. "If it is easier to dispose of an infectiveness claim" on one of the components, without addressing the other, "that course should be followed." *Id.*

In addition, counsel cannot be found ineffective for failing to make an argument or raise an objection that stood little to no chance of success. Where the underlying issue complained of by petitioner is meritless, counsel's failure to raise the issue does not fall outside the wide range of reasonable professional assistance nor is it reasonably likely that the result of the proceedings would have been different. *See, e.g., Aparicio v. Artuz*, 269 F.3d 78, 99 (2d Cir. 2001) (failure to raise a meritless argument "does not fall outside the wide range of professionally competent assistance to which [a] [p]etitioner [i]s entitled"); *United States v. Arena*, 180 F.3d 380, 396 (2d Cir.1999) ("Failure to make a meritless argument does not amount to ineffective assistance."); *Hall v. Phillips*, No. 04-cv-1514, 2007 WL 2156656, at * 13 (E.D.N.Y. July 25, 2007) ("The law in this circuit is clear that when the underlying claims themselves are found to be meritless, the ineffective assistance claim is meritless as well.")

A.      **Failure to Challenge Aiding and Abetting and *Pinkerton* Theories of Liability Based on Acquittal of Daniel Lugo**

Lugo claims that his counsel was ineffective for failing to challenge his indictment, conviction, and sentencing on the basis that he was improperly prosecuted for aiding and abetting his brother in the murder of Lanny Dillard, and for co-conspirator liability under *Pinkerton v. United States*, 328 U.S. 640, 641 (1946), after Daniel Lugo was acquitted at trial of Dillard's murder. In essence, petitioner argues that he cannot be found to have aided, abetted, or conspired with his brother in the commission of the crime, because Daniel Lugo, who petitioner refers to as the "principal," was found not guilty of that crime.[2]

---

[2]  Lugo claims in his most recent reply papers that, in instructing the jury on the theory of aiding and abetting on Count Two of the indictment, the court constructively amended the indictment. Since Count Two expressly charges Lugo with the violation of 18 U.S.C. § "2," the aiding and abetting statute, as well as "1959(a)(1)," this claim is meritless.

Petitioner's claims regarding his prosecution after his brother's acquittal have no merit. Under federal criminal law, "all participants in conduct violating a federal criminal statute are 'principals.' As such, they are punishable for their criminal conduct; the fate of other participants is irrelevant." *Standefer v. United States*, 447 U.S. 10, 20 (1980). The federal aiding and abetting statute provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a). This statute "evinces a clear intent to permit the conviction of accessories to federal criminal offenses despite the prior acquittal of the actual perpetrator of the offense." *Standefer*, 447 U.S. at 19. Consequently, a defendant accused of aiding and abetting the commission of a federal offense may be prosecuted and convicted even after the alleged perpetrator has been acquitted at trial.[3]

Here, as recounted above, the evidence was sufficient to establish that Lugo was hired by the D-Nice Enterprise to kill members of the Little Jus crew; that Lugo, acting in concert with his brother Daniel, murdered Lanny Dillard in the early morning hours of December 27, 2003; and that Lugo was paid in money, guns, and drugs for his role in the murder. *See United States v. Lugo*, 01-cr-922-NG, 2005 WL 1412137, at *1 (E.D.N.Y. June 15, 2005).[4] Moreover, although the government never claimed to know which Lugo brother was the actual shooter, the evidence

---

[3] In addition, because all participants in criminal conduct are deemed principals, "courts have encountered no difficulty sustaining convictions when the indictment did not specify whether the defendant was the aider and abettor or the principal." *United States v. Knoll*, 16 F.3d 1313, 1323 (2d Cir. 1994) (internal quotation marks omitted).

[4] Lugo brought post-conviction motions under Rules 29 and 33 of the Federal Rules of Criminal Procedure, arguing that the evidence was insufficient to establish that the Dillard murder was undertaken in exchange for payment from a RICO enterprise or "in aid" of racketeering. This court rejected this argument. *Lugo*, 2005 WL 1412137, at *1. When Lugo raised the same argument on direct appeal, the Second Circuit found it meritless. *Lugo*, 251 Fed. App'x 695. Accordingly, he cannot re-litigate this issue in a section 2255 proceeding. *See, e.g.*, *Yick Man Mui*, 614 F.3d at 53.

established that the two brothers acted in concert in the murder of Dillard, and that one of them was the shooter. *See id.* at *3-4. Accordingly, there is no question that they shared the same criminal intent.

The seemingly inconsistent verdicts between Lugo's conviction for acting in concert with Daniel Lugo to murder Dillard and his brother's acquittal, at a prior trial, on the same charges "does no more than manifest the simple, if discomforting, reality that different juries may reach different results under any criminal statute. That is one of the consequences we accept under our jury system. While symmetry of results may be intellectually satisfying, it is not required." *Standefer*, 447 U.S. 10 at 25 (internal quotation marks and citation omitted). Petitioner was entitled to "a fair trial at which the Government bore the burden of proving beyond a reasonable doubt" that he committed, aided and abetted the commission of, or was liable as a co-conspirator for the murder of Lanny Dillard. *Id.* at 26. "He was entitled to no less—and to no more." *Id.*

Accordingly, Lugo's counsel was not ineffective in failing to object to the jury instructions or otherwise challenge his conviction or sentence on this basis.[5]

### B. Speedy Trial Rights

Lugo contends that his various counsel were ineffective for failing to assert his speedy trial rights. Specifically, he alleges that: (a) his initial counsel, Peter Fabricant, agreed to waive his speedy trial rights without first consulting with petitioner, failed to challenge the court's designation of the case as "complex" for speedy trial purposes, and failed to object to the government's request for a continuance to accommodate the government attorney's trial schedule; (b) his trial counsel, Bobbi Sternheim, failed to move to dismiss the indictment on

---

[5] Petitioner's claim that the government engaged in prosecutorial misconduct by prosecuting him on aiding and abetting and *Pinkerton* theories of liability after Daniel Lugo's acquittal fails for the same reason.

speedy trial grounds; and (c) his appellate counsel, Marilyn Reader and Uzmah Saghir, failed to raise the purported speedy trial violation on direct appeal. These claims have no merit, because a motion to dismiss on speedy trial grounds would not have been successful.

Under the Speedy Trial Act, 18 U.S.C. §§ 3161-1374, the trial of a criminal defendant "shall commence within seventy days from the filing date . . . of the . . . indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). The statute permits exclusions of time for, among other things, "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government," if the court finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." *Id.* § 3161(h)(8)(A).

The original indictment was filed on August 15, 2001, and a superseding indictment was filed on June 7, 2002. After Lugo was finally apprehended in January 2003, he was arraigned on the superseding indictment on January 28, 2003. Represented by Mr. Fabricant, petitioner appeared on February 5, 2003 for the first time before Judge Weinstein. At that initial conference, the court set trial for mid-July. With defense counsel's consent, the court excluded time from February 5, 2003 until July 14, 2003 in the interests of justice to accommodate the government attorney's schedule and to allow defense counsel adequate time to review the extensive discovery record, which included the lengthy transcript of the earlier trial of Daniel Lugo, Tyler, and others for the same murder. The court found on the record that the continuance was justified "in the public interest and so that the parties can prepare and examine the voluminous documents." (Pet'r Ex. A at 4:14-17.)

- 14 -

After the case was reassigned to the Hon. Allyne R. Ross, district judge, a status conference was held on July 1, 2003. At that conference, petitioner's newly substituted counsel, Ms. Sternheim, informed the court that she needed time to review the file and had informed petitioner that she would not be available for trial until November 2003. Petitioner expressly acknowledged on the record that he had spoken with counsel about her lack of availability and had no objection to putting the trial date over to November. (Resp't's Sept. 25, 2009 Memo., Ex. F at 3:15-19.) The court granted a continuance until November 10, 2003, finding that the delay was "in the interests of justice to ensure the defendant is represented by counsel of his choice in view of her schedule." (*Id.* at 5:17-23) The case was then reassigned to me, and trial commenced on December 15, 2003. In sum, at the time the trial started, there were 30 days remaining on the speedy trial clock.

First, petitioner's claim that the ends-of-justice continuance from February 5 to July 14, 2003 required his consent is incorrect. An attorney may seek, or consent to, a continuance "without obtaining his client's approval." *United States v. Lynch*, 726 F. 3d 346, 354 (2d Cir. 2013); *see also* 18 U.S.C. § 3161(h)(7)(A) (providing that a continuance may be granted "at the request of the defendant *or* his counsel") (emphasis added). The statute, which "does not include the defendant's consent among the factors a court must consider" in granting a continuance, also "allows the district court to grant a continuance on its own initiative if the interests of justice justify such a delay." *Lynch*, 726 F.3d at 356 (quotation marks omitted).[6]

---

[6] Petitioner's claim that counsel failed to consult with him regarding the continuance is belied by Mr. Fabricant's affidavit. Fabricant, an attorney with over thirty years' experience trying felony criminal cases, affirms that, although he cannot remember any particular conversation with petitioner, it was and continues to be his practice "to consult with [his] client and explain the ramifications of any substantial aspect of the case, and certainly any potential waiver" of a client's rights. (Fabricant Aff. ¶ 6.) Lugo's own conduct also indicates his willingness to consent to lengthy continuances, as demonstrated by his agreement on the record to a continuance from

Second, there is no merit to petitioner's contention that the ends-of-justice continuances were not warranted under the Speedy Trial Act. Petitioner principally challenges the court's decision to grant a continuance from February to July 2003 because of the "complexity" of the case and the government attorney's conflicting trial schedule. These reasons fall squarely within the grounds authorized by the statute, which directs the trial court to consider the "reasonable time necessary for effective preparation" for trial and the "continuity of counsel" of either the defendant or the government in granting an "ends of justice" continuance. 18 U.S.C. § 3161(h)(7)(A). As a result of the prior trial of four co-defendants, petitioner's trial counsel required substantial time to "examine the voluminous discovery that had been provided by the prosecutor," "examine the transcript of [the] prior trial," and "interview potential witnesses." (Fabricant Aff. ¶ 5.) Under these circumstances, counsel's belief that a continuance "was necessary so that the defense could be prepared to go to trial with a chance of winning an acquittal" was entirely warranted. (*Id.*¶ 8.) Moreover, the court's decision to schedule the trial so as to accommodate the government attorney's month-long trial scheduled for late-April 2003 ensured that the government would not unreasonably be denied continuity of counsel. *See, e.g.*, *United States v. Richardson*, 421 F.3d 17, 29-30 (1st Cir. 2005).

Third, even assuming that the court's express findings were somehow insufficient to satisfy the ends of justice rubric required by section 3161(h)(7), a motion to dismiss on speedy trial grounds would have been unsuccessful. Had such a motion been made, the court assuredly would have placed on the record a more explicit finding that the ends of justice served by the granting of each continuance outweighed the best interests of the public and the defendant in a

---

July to November 2003 to accommodate his defense counsel's schedule (*see* Resp't's Sept. 25, 2009 Memo., Ex. F at 3), and his implicit understanding that counsel would require a substantial amount of time to prepare for trial (*see id.*, Ex. G at 7).

speedy trial. *See Zedner v. United States*, 547 U.S. 489, 506-07 (2006); *United States v. Breen*, 243 F.3d 591, 596-97 (2d Cir. 2001) (explaining that "trial is neither a game nor an obstacle course; failure to utter the magic words 'ends-of-justice' at the time of ordering the continuance is not necessarily fatal").

Finally, even if petitioner's trial counsel had brought a successful motion to dismiss under the Speedy Trial Act, the statutory factors strongly indicate that a dismissal would have been without prejudice. *See* 18 U.S.C. § 3162(a)(2). The charges in the case, including a murder for hire, were unquestionably serious; the circumstances leading to the delay were valid; the re-prosecution of petitioner would have served the interests of justice; and petitioner has not credibly alleged that he suffered prejudice from having been tried within a year of his apprehension.[7] After a dismissal without prejudice, the government would have been free to bring a new indictment on the same charges. *See, e.g., United States v. Payne*, 591 F.3d 46, 59 (2d Cir. 2010) (no statute of limitations for murder in aid of racketeering in violation of 18 U.S.C. § 1959(a)(1)); 18 U.S.C. § 3290 (statute of limitations tolled for "any person fleeing from justice"). There is simply no reason to have required trial counsel to bring a motion that would have only served to further prolong the proceedings. *See Jones v. United States*, 543 F. App'x 67, 71 (2d Cir. 2013) ("[Counsel's] decision not to bring a motion to dismiss that was unlikely to succeed and would inevitably lead to further delay was perfectly reasonable.").

Since a motion to dismiss would not have been successful, and, even if successful, would have been without prejudice, the challenge to the effectiveness of trial and appellate counsel for

---

[7] Lugo asserts that the delay in his trial date "cut [him] off from potential witnesses in his favor, as those he located had moved during [the] delays," but he offers no facts to support this conclusory assertion. (*See* Pet'r's Apr. 29, 2009 Memo. at 5.) His assertion is also contradicted by his counsel, who affirms that he is "unaware of any potential witnesses who moved away during the delay. (Fabricant Aff. ¶ 8.)

not raising a speedy trial claim is without merit. Petitioner can show neither unprofessional conduct nor prejudice.

## C.     Failure to Move to Suppress Post-Arrest Statements

Petitioner claims that trial counsel was ineffective in failing to move to suppress his post-arrest statements.[8] To demonstrate ineffective assistance of counsel with respect to the failure to make a motion to suppress, "the underlying motion must be shown to be meritorious, and there must be a reasonable probability that the verdict would have been different if the evidence had been suppressed." *United States v. Matos*, 905 F.2d 30, 32 (2d Cir. 1990).

Lugo was arrested in January 2003 for using a false driver's license. On January 10, 2003, Special Agent Patricia McGrane of the Bureau of Alcohol, Tobacco and Firearms, along with New York City Corrections Officer Craig Fusco, interviewed Lugo in an office at the New York City Criminal Courthouse in Brooklyn. According to her trial testimony, McGrane informed Lugo of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), before questioning him. She memorialized the interview in a report dated February 11, 2003, but she did not have Lugo sign a waiver form and was unable to locate her contemporaneous notes of the interview.

McGrane testified that she informed Lugo that she had a warrant for his arrest for the murder of Lanny Dillard. Lugo denied any involvement in the murder. After McGrane told him that she knew that he and his brother had committed the murder and that he had received money, drugs, and guns as payment from Stokes, he again disavowed any knowledge of the murder and

_____

[8] On direct appeal, Lugo argued that the district court erred in admitting his post-arrest statements in violation of his Sixth Amendment right to counsel and his Fifth Amendment right to remain silent. The Second Circuit considered this argument and found it to be without merit. *Lugo*, 251 F. App'x 695. Petitioner, however, did not challenge counsel's effectiveness regarding the suppression of his post-arrest statements before the Second Circuit, and the government does not argue that the Circuit's decision precludes consideration of petitioner's ineffectiveness claim on habeas review.

denied having received any payments from Stokes. A few minutes later, he told McGrane that he had received money from Stokes on one occasion. He also stated that her assertion that he committed a murder with Daniel Lugo was impossible, because he did not get along with his brother.

On October 3, 2003, Lugo filed a *pro se* letter motion requesting that the court relieve Ms. Sternheim as counsel, principally because she had refused to file a motion to suppress these statements. At a status conference held on October 22, 2003, Ms. Sternheim explained to the court that Lugo wanted her to move to suppress the statements on the ground of prosecutorial misconduct: the government, in its initial Rule 16 discovery letter, had indicated that Lugo had not made any post-arrest statements; later, in September 2003, the government informed defense counsel that its initial representation was mistaken and promptly provided counsel with a copy of the statements.

At the status conference, Ms. Sternheim expressed her view that a motion to suppress the statements based on the government's delayed disclosure, or any other grounds, would be meritless:

> Mr. Lugo . . . felt that the government was bound by its initial letter. Unfortunately, having had experience with those matters, although it sounds like a very plausible way of defending that, I did not think there anything was to be gained by making a motion for prosecutorial misconduct or to suppress the statement based upon the facts and circumstances as I view them.

(Oct. 22, 2003 Status Conf. Tr. 5:9-14.) She also explained that she had discussed the suppression motion with Lugo and had advised him that it was not likely to be successful and risked exposing him to a sentencing enhancement:

> Your Honor, I discussed with Mr. Lugo the situation concerning the statement. I do not feel it is in his best interest because of penalties that can arise out of making such a motion. If Mr. Lugo states in open court that given that information he wants me to

> make the motion, I will make the motion. But there are risks
> associated with making a suppression motion concerning a
> statement and the basis for the motion has to do with the fact that
> he claims he never made the statement and there are problems with
> regard to those contentions. . . . He needs to know he has to make a
> sworn affidavit and should it come to pass that we're not
> successful, which I gauge we will not be, that he runs the risk of
> getting an enhancement in the event there is conviction here.

(*Id.* 14:12-15:5.) Counsel's colloquy with the court reveals that, based on a careful evaluation of the underlying facts, counsel determined that a suppression motion would be unlikely to succeed; that it was not supported by an adequate factual basis; and that, if unsuccessful, Lugo's testimony in support of the motion risked exposing him to an obstruction of justice enhancement. Despite her advice, counsel left open two avenues for Lugo to challenge the statements: she would file a suppression motion if Lugo directed her to do so in open court, or he could file a *pro se* motion. (*See id.* 5:18-21.) When the court inquired at the next status conference regarding the status of the motion, counsel responded that no motion to suppress the post-arrest statements had been filed, and Lugo did not object.

With respect to the merits, any challenge based on the government's belated Rule 16 disclosure would have been fruitless, among other reasons because Lugo has not established that his defense was prejudiced in any way by the delay in disclosing the statements. *See, e.g., United States v. Yousef,* 327 F.3d 56, 147 (2d Cir. 2003). The statements were produced to the defense in September 2003, nearly three months before trial. Subsequently, when defense counsel indicated during her cross-examination of Special Agent McGrane that she did not have the entirety of the report, the government promptly provided defense counsel with a copy of the full report; counsel cross-examined McGrane about the circumstances of its preparation, which had been marked as an exhibit under 18 U.S.C. § 3500; and any delayed disclosure of the report did not hinder the cross-examination. Therefore, Lugo's defense was not prejudiced.

A suppression motion alleging that the statements were procured in violation of Lugo's *Miranda* rights presents a fact-based inquiry. If petitioner had moved to suppress his post-arrest statements, the government would have had the burden of showing, by a preponderance of evidence, that Lugo knowingly and voluntarily waived his *Miranda* rights. *See, e.g., United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012). To show that it would have met this burden, the government relies on Special Agent McGrane's trial testimony that she read Lugo his *Miranda* rights before questioning him. Lugo asserts, in response, that he was never read his rights. To buttress his denial, he points to the agent's failure to obtain a signed waiver form—in contrast to the signed waivers she obtained of the cooperating witnesses in this case—and her inability to locate her contemporaneous notes of the interview. The credibility of Lugo's assertion is undercut by the reservations that his highly experienced defense counsel evidently harbored regarding whether such a motion was supported by an adequate factual basis. At a minimum, counsel viewed that there were "problems" with Lugo's contention that he never made the statements at issue. Ultimately, there is no way to assess whether a suppression motion would have been successful without holding an evidentiary hearing to resolve these competing narratives.

Nevertheless, Lugo cannot establish constitutionally ineffective assistance because he cannot show a reasonable probability that the verdict would have been different—*i.e.*, that he would have been acquitted on any of the charges—had the post-arrest statements been suppressed. The statements to Special Agent McGrane were largely exculpatory: Lugo denied any knowledge of or involvement in the murder of Dillard, and he denied having received guns or drugs from Stokes. The only admission probative of guilt was his acknowledgment that he knew Stokes and had received money from him on one occasion.

And, unlike in *Matos*, where scant admissible evidence supporting the conviction would have remained had the suppression motion been granted, *see* 905 F.2d at 33, a wealth of much more incriminating evidence weighed against Lugo. As described in the factual background above, four cooperating witnesses directly implicated Lugo in the murder conspiracy. Stokes, for example, testified that the D-Nice Enterprise hired Richard and Daniel Lugo as hit men to locate and murder members of the Little Jus crew; in Stokes's presence, Tyler gave Lugo money as a down payment for his services; Stokes and other members of the D-Nice Enterprise met with Richard and Daniel Lugo to advise them that members of the Little Jus crew were likely to attend a party in Manhattan the following night; he then met Richard and Daniel Lugo on the night of the murder in the vicinity of the party; and, in the days following the killing, he observed Tyler make the balance of a $30,000 payment to Lugo; and, he personally delivered two guns and heroin to Lugo as payment for Dillard's murder. At these meetings, Lugo offered to kill additional members of the Little Jus crew in exchange for further payments. Moreover, Lugo's own letter to Lorenzo, in which he admitted having agreed to "rock" someone in exchange for $10,000 and a car, was far more probative of guilt than the statements he made to Special Agent McGrane. Accordingly, Lugo cannot establish that he was prejudiced by his counsel's failure to move to suppress the post-arrest statements; he has not shown that there is a reasonable probability that the outcome of the trial would have been different if the evidence had been suppressed.

### D. Arraignment on Second Superseding Indictment

Lugo claims that counsel was ineffective because he was never arraigned on the second superseding indictment. This claim is belied by the record. Lugo was arraigned on the indictment at issue on November 21, 2003. (*See* Nov. 21, 2003 Status Conf. Tr. at 2:11-15.)

To the extent that Lugo complains that his arraignment did not comply with the formalities of Rule 10 of the Federal Rules of Criminal Procedure regarding the reading of the indictment, this claim is similarly unavailing. The absence of a formal arraignment does not deprive "the accused of any substantial right." *United States v. Joyner*, 201 F.3d 61, 79 (2d Cir. 2000) (internal quotation marks omitted); *Garland v. Washington*, 232 U.S. 642, 645 (1914) (no deprivation of any substantial right "so long as it appears that the accused has sufficient notice of the accusation and an adequate opportunity to defend himself in the prosecution"). The failure to read or summarize the charges to Lugo at the November 21, 2003 arraignment did not affect any substantial right. Lugo received a copy of the second superseding indictment and discussed it with counsel before entering a plea of not guilty. Further, the second superseding indictment did not substantively amend the charges against him, and Lugo does not claim any defect with respect to his arraignment on the superseded indictment.

### E.    Prosecutorial Misconduct For Eliciting False Testimony

Lugo claims that his counsel was ineffective in failing to file a motion for prosecutorial misconduct. He argues that the government presented inconsistent factual theories as to the identity of the murderer at his trial and the prior trial of Daniel Lugo, and that the testimony of cooperating witnesses Stokes and Lefkowitz was inconsistent with their testimony at the first trial. The court rejected these same claims when Lugo raised them in his post-conviction motions. *Lugo*, 2005 WL 1412137, at \*2-3 (finding, *inter alia*, that Stokes's testimony "was not so inconsistent as to unjustly taint the verdict" and that "there was no significant factual inconsistency in the cases presented by the government at the two trials"). The Second Circuit affirmed. 251 F. App'x 695. Lugo cannot re-litigate these issues on collateral review. *Yick Man Mui*, 614 F.3d at 53.

## F. Failure to Challenge the Sufficiency of the Evidence

Lugo claims that Ms. Sternheim's performance at trial was constitutionally deficient because she failed to argue to the jury that the testimony of the government's principal cooperating witnesses, Stokes and Lefkowitz, conflicted with their testimony at Daniel Lugo's trial, and because she did not emphasize the inability of the victim's spouse to identify petitioner or place him at the scene of the shooting. These claims are not supported by the record.

"[I]it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Harrington v. Richter*, 131 S. Ct. 770, 791 (2011). In this case, Ms. Sternheim vigorously cross-examined Stokes and Lefkowitz about their prior inconsistent testimony and, on summation, argued to the jury at length that their testimony should be rejected as "outrageously inconsistent" and unreliable. (*See, e.g.*, Tr. 2238.) Counsel also argued that Dillard's wife, who had "the best opportunity to see what happened," gave a number of descriptions of the shooter, none of which matched Lugo; twice failed to pick him out of photo arrays; and did not identify him in open court. (*See* Tr. 2258.)

Ms. Sternheim's representation of Lugo at trial was far more than constitutionally adequate. Counsel's performance evinced a thorough commitment to petitioner's defense. She exhibited skillful lawyering in the face of significant evidence against petitioner; her cross-examination of the government's witnesses effectively highlighted the themes of the defense case; and her summation was powerful. In short, she was a forceful advocate on petitioner's behalf.

## G. Failure to Investigate

Petitioner also claims that his trial counsel was ineffective for failing to adequately investigate his case. Specifically, he claims that counsel should have called three witnesses to testify on his behalf: (1) an unnamed member of the D-Nice Enterprise, who he asserts would

- 24 -

have testified that "Danny [Lugo] killed the nigga, I don't know why they want Richie [Lugo]";

(2) his brother, Daniel Lugo, who would testify that he was acquitted of the same murder charge;

and (3) New York City Corrections Officer Craig Fusco, who was present when Special Agent

McGrane interviewed Lugo.

Lugo cannot show that counsel was ineffective for failing to call these witnesses at trial.

"The decision whether to call any witnesses on behalf of the defendant, and if so which

witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every

trial." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). Given the inherently

strategic nature of the decision not to call a particular witness, the Second Circuit generally has

refrained from disturbing such choices by trial counsel. *See Greiner v. Wells*, 417 F.3d 305, 323

(2d Cir. 2005) ("The decision not to call a particular witness is typically a question of trial

strategy that [reviewing] appellate courts are ill-suited to second-guess.") (quotation marks

omitted, alteration in original); *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (holding

that "counsel's decision as to whether to call specific witnesses—even ones that might offer

exculpatory evidence—is ordinarily not viewed as a lapse in professional representation")

(internal quotation marks omitted).

On the facts presented here, trial counsel's decision not to call the witnesses proffered by

Lugo was well within the wide range of reasonable professional assistance, and petitioner cannot

show a reasonable probability that the results of the trial would have been different had his

counsel attempted to secure their testimony. The testimony of an unidentified witness that Daniel

Lugo shot Dillard, even if admissible, would not have rebutted the government's theory of the

case—*i.e.*, that the Lugo brothers acted in concert in killing Dillard—and would have critically

undermined the defense theory that neither of the Lugo brothers was involved in the shooting (*see, e.g.*, Tr. 2242-43 (defense counsel's summation)).

Counsel's decision not to call Daniel Lugo also was reasonable and did not prejudice petitioner. First, even if the fact of Daniel Lugo's acquittal on the same charges were admissible at Richard Lugo's trial,[9] it is highly unlikely that Daniel Lugo would have agreed to testify, rather than exercise his Fifth Amendment privilege against self-incrimination; he did not testify on his own behalf at his own trial, and the appeal of his conviction was pending at the time of Richard Lugo's trial. Second, had Daniel Lugo testified that he had been acquitted of Dillard's murder, this testimony would have opened the door to testimony that he had been convicted of conspiracy to murder members of the Little Jus crew. *See, e.g.*, Greiner, 417 F.3d at 323–24 (failure to call witness justified where potential existed for opening the door to introduction to lines of inquiry harmful to the defense). Since the record does not establish that there is a reasonable probability that Daniel Lugo would have testified or that his testimony would have materially affected the verdict, petitioner cannot show that trial counsel's decision was deficient or that he was prejudiced by counsel's decision.

Finally, with respect to defense counsel's failure to call Officer Fusco, Lugo asserts that the witness "would have verified that no *Miranda* Waiver was signed." The government never argued, however, that a *Miranda* waiver was signed, only that Lugo had been advised of his *Miranda* rights. Moreover, it would have been reasonable to expect that Officer Fusco's testimony would have corroborated Special Agent McGrane's testimony regarding Lugo's admission that he had received a payment from Stokes. For this reason, trial counsel's decision

---

[9] "Evidence of acquittal of one jointly indicted with the accused is not admissible on behalf of the accused as tending to establish that he or she is also innocent." *See* 23 C.J.S. Criminal Law § 1336; *see also Standefer*, 447 U.S. at 20 ("the fate of other participants is irrelevant").

to challenge the McGrane's credibility through cross-examination alone was not an unreasonable strategic choice.

In sum, petitioner has not established that his counsel's failure to call the three witnesses he identifies fell below an objective standard of reasonableness or prejudiced the defense.

### H. Failure to File Motion for a New Trial

Lugo appears to claim that his counsel in 2007 was ineffective for failing to seek a new trial pursuant to Federal Rule of Criminal Procedure 33 on the basis of "newly discovered evidence." On January 12, 2007, Christopher Reese Thomas, a federal prisoner, filed an affidavit on Lugo's behalf. This court rejected the Thomas affidavit on January 8, 2008 as an "unauthorized submission." In the affidavit, Thomas describes several purported jailhouse conversations with Tyler, Hunter, and Daniel Lugo.[10] Briefly stated, Thomas alleges that Tyler and Hunter told him that the motive behind Dillard's murder was to avenge the death of Tweety, who was not involved in the D-Nice Enterprise's narcotics activities, and that Daniel Lugo informed him that "none of the other defendants indicted were there when Mr. Dillard was fatally shot."

To secure a new trial based on newly discovered evidence, a defendant must show that the new evidence "could not with due diligence have been discovered before or during trial, that the evidence is material, not cumulative, and that admission of the evidence would probably lead to an acquittal." *United States v. Owen*, 500 F.3d 83, 87 (2d Cir. 2007) (internal quotation marks omitted). Relief under Rule 33 is only to be granted "sparingly and in the most extraordinary

---

[10] This is not the first case in which Thomas, a self-styled jailhouse lawyer, has submitted affidavits purporting to attest to admissions by fellow inmates. *See, e.g.*, *United States v. Camacho*, 353 F. Supp. 2d 524, 526 (S.D.N.Y. 2005), *aff'd and remanded sub nom. United States v. Rodriguez*, 187 F. App'x 30 (2d Cir. 2006).

circumstances." *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quotation marks omitted).

Lugo cannot establish that Thomas's affidavit contains any newly discovered evidence that would have warranted a new trial. First, because none of the statements set forth in the Thomas affidavit is against the penal interest of any of the declarants, *see* Fed. R. Evid. 804(b)(3), Thomas's testimony regarding his purported conversations with the declarants would be inadmissible at trial. As such, the "new evidence" cannot "probably lead to an acquittal." *See United States v. Parker*, 903 F.2d 91, 102-03 (2d Cir. 1990). Second, evidence that Dillard's murder was motivated by a desire to avenge the murder of Tyler's brother Tweety would not call into question petitioner's conviction. In denying petitioner's post-trial motion, this court rejected Lugo's argument that the government was "required to 'exclude' a personal vendetta as a purpose for the killing." *See Lugo*, 2005 WL 1412137, at *2. The newly proffered statements supporting a revenge motive do not undermine the grounds for this holding. *See id.*

Accordingly, counsel's failure to seek a new trial based upon the Thomas affidavit was neither deficient nor prejudicial.

## I. Failure to Challenge Conviction Based on Court's Statement That Petitioner Was Found Not to Have Discharged a Weapon

Petitioner claims that counsel was ineffective for failing to challenge his murder conviction based on a statement by the court at sentencing that it would "not be able to make a finding that this defendant discharged a weapon himself."[11] Lugo argues that, because the court

---

[11] The court was initially uncertain as to whether petitioner had been charged with aiding and abetting and *Pinkerton* liability with respect to Count Three of the indictment, which charged him with the possession and use of a firearm in furtherance of a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). Under then-prevailing Supreme Court law, section 924(c)(1)(A) defined a single offense, in which the discharge of a firearm was a sentencing factor to be found by the court, not an element of the crime to be submitted to the jury. *See Harris v. United States*, 536 U.S. 545 (2002) (overruled by *Alleyne*, 133 S. Ct. at 2155). After confirming that Lugo had

found that he had "not . . . discharged a weapon," he could not be found guilty of a murder perpetrated by gunshot. This contention misapprehends the bases for liability in this case. The jury was charged with three theories of liability: (1) that Lugo personally committed the murder; (2) that Lugo aided and abetted his brother Daniel in the commission of the murder; and (3) that Lugo was guilty under co-conspirator or *Pinkerton* liability. Both the aiding and abetting and *Pinkerton* theories of liability properly permitted the jury to convict petitioner for murder without concluding that he personally pulled the trigger, that is, that he personally discharged a weapon. Accordingly, this claim is without merit.

## J.     Conflict of Interest Between Petitioner And Trial Counsel

Petitioner claims that a conflict of interest existed between him and his counsel and that this conflict adversely affected counsel's performance. Lugo, however, points to no actual or potential conflict of interest. Rather, he simply indicates that he had a series of disagreements with counsel regarding her decision not to move to file a suppression motion or motion alleging prosecutorial misconduct based on the government's delayed disclosure of Lugo's post-arrest statements. Disagreements as to trial strategy do not amount to a conflict of interest. *United States v. Rahman*, 189 F.3d 88, 144 (2d Cir. 1999).

Moreover, to the extent that Lugo complained in October 2003 that he did not trust trial counsel and sought to have counsel relieved, those issues had been resolved prior to trial. At a pretrial conference held on December 8, 2003, the court inquired "about Mr. Lugo's satisfaction with counsel" and remarked that at "[t]he last two pretrial conferences it seems to me that Mr. Lugo and Ms. Sternheim were communicating freely with one another and any issues seem to

___

been charged with aiding and abetting and *Pinkerton* liability on the firearms charge, the court found him responsible for the discharge of a weapon in connection with the murder of Lanny Dillard.

have been resolved." (Dec. 8, 2003 Status Conf. Tr. at 2.) Both counsel and petitioner indicated that they concurred in the court's assessment. *Id.*

Accordingly, there is no merit to Lugo's assertion that he had a conflict of interest with his trial counsel, or that counsel rendered ineffective assistance as a result.

### K. Advice Regarding Government's Plea Offer

Lugo also claims that his conviction should be vacated because he received ineffective assistance of counsel in the context of plea negotiations. Specifically, relying on *Lafler v. Cooper*, --- 566 U.S. ----, 132 S. Ct. 1376 (2012), he claims that Ms. Sternheim failed to properly advise him of the consequences of rejecting the government's pre-trial offer of a plea to a single conspiracy count that carried a ten-year statutory maximum sentence.

The Sixth Amendment guarantees the right to effective assistance of counsel at all "critical stages" of a criminal proceeding, *United States v. Wade*, 388 U.S. 218, 226 (1967), including during the plea-bargaining process, *see, e.g., Padilla v. Kentucky*, 559 U.S. 356, 373 (2010). While a criminal defendant "has no right to be offered a plea . . . nor a federal right that the judge accept it," *Missouri v. Frye*, --- U.S. ----, 132 S. Ct. 1399, 1410 (2012), "[i]f a plea bargain has been offered, a defendant has the right to effective assistance of counsel in considering whether to accept it," *Lafler*, 132 S. Ct. at 1387. *See also Gonzalez v. United States*, 722 F.3d 118, 130 (2d Cir. 2013).

Claims of ineffective assistance of counsel in the plea context, like other ineffectiveness claims, are governed by the familiar standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Frye*, 132 S. Ct. at 1405 (citing *Hill v. Lockhart*, 474 U.S. 52 (1985)). To provide constitutionally adequate representation during plea negotiations, a lawyer must generally advise the client of any offer that the government extends, *Frye*, 132 S. Ct. at 1408; *Pham v. United States*, 317 F.3d 178, 183 (2d Cir. 2003); outline "the strengths and weaknesses of the case

against him," *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000); and provide an estimate of the defendant's sentencing exposure at trial, *id.* To establish prejudice with respect to a rejected plea offer, a "defendant must show the outcome of the plea process would have been different with competent advice." *Lafler*, 132 S. Ct. at 1384.

Petitioner concedes that Ms. Sternheim "conveyed the government's offer to [him]," and he does not deny that she advised him to plead guilty. Rather, he claims that she "did not competently advise me on the offer or the potential sentence exposure." (Pet.'s Aug. 14, 2012 Mot. at 6.) In particular, petitioner asserts that counsel "misinformed [him] that the murder count would be dismissed [and] if [he] went to trial and was convicted, [he] would be sentenced to ten years for conspiracy to murder and five years for the gun offense." (Pet.'s Aug. 14, 2012 Mot. at 8-9.) This argument, like many of petitioner's other claims, is supported only by conclusory assertions. Lugo does not describe any specific conversations with Ms. Sternheim, nor does he provide any evidence of their discussions, other than his own self-serving and improbable assertions regarding counsel's advice.[12]

What little specificity Lugo provides is contradicted by Ms. Sternheim's detailed and internally logical declaration, and his assertions are patently incredible in light of counsel's wealth of experience and knowledge of the federal criminal justice system. Ms. Sternheim denies advising petitioner that the murder charge would be dismissed; to the contrary, she explained the consequences of going to trial and the possibility of a life sentence if found guilty. (Sternheim

---

[12] Petitioner did not raise the claim of deficient advice with respect to the plea offer until August 14, 2012, more than seven years after he was sentenced to a life term of imprisonment. During the intervening years, Lugo filed numerous claims of ineffective assistance of counsel regarding trial counsel's performance. In none of those prior claims did Lugo ever contend that Ms. Sternheim failed to advise him that, if convicted of murder in aid of racketeering, he faced a mandatory life sentence. The lengthy and unjustified delay in bringing this claim undermines the credibility of his allegations. *See, e.g., Nicholson v. United States*, 566 F.Supp.2d 300, 305 (S.D.N.Y. 2008).

Decl. at ¶¶ 8-9, 11.) Moreover, because of the favorable terms of the government's plea offer, which would have guaranteed petitioner a sentence similar to his brother's without the risks of trial, Ms. Sternheim even enlisted Lugo's family in a last-ditch effort to convince him to accept the government's offer. (*Id.* ¶ 15.) Petitioner declined to do so and affirmatively stated to the court that he wished to proceed to trial.

Where, as here, petitioner brings "a generic claim . . . based solely on his own highly self-serving and improbable assertions," and when counsel provides a "detailed description of events [that is] eminently credible," a district court may dispose of a section 2255 motion without holding a full-blown evidentiary hearing. *Chang v. United States*, 250 F.3d 79, 86 (2d Cir.2001). In *Chang*, the Second Circuit held that, where a petitioner and his counsel have submitted conflicting affidavits on a question relating to the advice defense counsel gave to petitioner, a district court can properly conclude that "the testimony of [the petitioner] and his trial counsel would add little or nothing to the written submissions." 250 F.3d at 86. After considering the various affidavits, the court concludes that petitioner has failed to overcome the strong presumption that counsel's conduct fell within the range of reasonable professional assistance. Accordingly, petitioner's claim is denied.

### L.    Ineffective Assistance of Appellate Counsel

Petitioner claims that his conviction should be vacated because his appellate counsel, Uzmah Saghir, was constitutionally ineffective. He generally alleges that her unprofessional conduct in failing to timely file a brief on his behalf and failing to reply to the government's opposition brief constituted a "constructive denial of counsel" and that Saghir's "performance impaired the entire appellate process." (*See* Pet.'s May 21, 2013 Motion at 3, 5.)

Lugo was initially represented on appeal by Marilyn Reader Esq. On September 25, 2006, Ms. Reader filed an appellate brief on petitioner's behalf, arguing that the evidence at trial

was insufficient to support his conviction for murder in aid of racketeering and that the Court erred in admitting a custodial statement he made to a law enforcement officer. In January 2007, Uzmah Saghir moved to replace Ms. Reader as Lugo's counsel and to file a supplemental brief on his behalf. *In re Saghir*, 595 F.3d 472, 474-75 (2d Cir. 2010). After the motion was granted, Saghir failed to file the supplemental brief by the proscribed deadline. *Id.* at 475. Saghir filed a new motion requesting that the court disregard prior counsel's brief and allow the filing of a new brief; this motion also was granted. *Id.* Saghir again failed to file an appellate brief. *Id.* At oral argument, Saghir acknowledged that her failure to submit the brief was "due to [her] own incompetence." *Id.*

After the Second Circuit once again granted Saghir leave to file a new brief, but warned that she faced potential sanctions, she finally complied and filed the supplemental brief on October 2, 2007. *Id.* The supplemental brief argued that venue was improper with respect to the murder in aid of racketeering charge and that Lugo's trial counsel was ineffective on account of the failure to raise a venue challenge. Lugo also submitted a *pro se* brief, arguing that the court erred in instructing the jury. The Second Circuit affirmed Lugo's conviction on October 24, 2007. *Lugo*, 251 F. App'x 695. Approximately one month after the affirmance, the Second Circuit received a letter from Lugo stating that he had been unable to contact Saghir, had not received a copy of the supplemental brief, and was unaware of the status of the case. *In re Saghir*, 595 F.3d at 475. In sum, Saghir's representation of petitioner on appeal—including her failure to timely file a brief on petitioner's behalf and keep him apprised of his appeal—unquestionably fell below the objective standard of reasonableness required by *Strickland*.

Notwithstanding counsel's unprofessional conduct, petitioner cannot prevail on his ineffectiveness claim because he has not established that counsel's actions caused him any

prejudice. First, the Second Circuit gave Saghir multiple opportunities to remedy her failure to comply with the Court's scheduling orders, and she ultimately filed a brief on petitioner's behalf. Even though the brief was late, the Second Circuit considered the arguments raised in each of the three briefs filed on his behalf—i.e., the Reader brief, the Saghir brief, and his *pro se* brief—and found them to be without merit. *Lugo*, 251 F. App'x 695.

More important, petitioner is unable to identify any meritorious claim that his counsel should have pressed on appeal. In fact, as discussed elsewhere in this opinion, each of petitioner's specific allegations of ineffective assistance has been found to be entirely without merit. Without a potentially meritorious ground for reversal of his conviction, petitioner cannot show that, but for counsel's errors, there is a reasonable probability that the result of his direct appeal would have been different. *See Strickland*, 466 U.S. at 694; *see also Castro v. United States*, 993 F. Supp. 2d 332, 347 (E.D.N.Y. 2014). Accordingly, because petitioner cannot establish prejudice, his claim that he was denied the effective assistance of appellate counsel is rejected.

**III.    Petitioner's Claim under *Alleyne v. United States***

Lastly, Lugo claims that his ten-year sentence for using or carrying a firearm in furtherance of a crime of violence should be vacated in light of *Alleyne v. United States*, --- U.S. ----, 133 S. Ct. 2151 (2013).

Lugo was convicted of using or carrying a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). A defendant who is convicted of a section 924(c)(1)(A) offense is subject to a higher mandatory minimum sentence if the firearm was discharged than if it merely was carried or brandished. *See* 18 U.S.C. § 924(c)(1)(A)(i)-(iii). In this case, the government did not charge, and the jury did not find beyond a reasonable doubt, that petitioner discharged a firearm in connection with the murder of Lanny Dillard. Instead, the court found at

sentencing, by a preponderance of the evidence, that a firearm was discharged in connection with Dillard's murder, and that Lugo was liable for the weapon's discharge under aiding and abetting or *Pinkerton* liability. This finding increased the mandatory minimum sentence on the firearms charge from five years to ten years.

Lugo argues that his sentence violated his Sixth Amendment right to trial by jury, because the jury did not find beyond a reasonable doubt that a firearm had been discharged. *See* Pet.'s Sept. 12, 2013 Mot. at 4. In *Alleyne*, the Supreme Court overruled *Harris v. United States*, 536 U.S. 545 (2002), and held that "any fact that increases [a criminal defendant's] mandatory minimum sentence is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." 133 S. Ct. at 2155. *Alleyne*, however, "did not announce a new rule of law made retroactive on collateral review." *United States v. Redd*, 735 F.3d 88, 92 (2d Cir. 2013) (per curiam). Because petitioner's conviction became final in 2008, well before *Alleyne* was decided, his claim for relief is without merit. *Id.*[13]

Moreover, even if Lugo could assert a claim under *Alleyne*, his arguments for vacating his sentence are without merit. "Where the evidence supporting an element that was not submitted to the jury is 'overwhelming' and 'essentially uncontroverted,'" a sentencing enhancement based on a fact that should have been submitted to the jury will be affirmed despite the error. *United States v. Santana*, 552 F. App'x 87, 92 (2d Cir. 2010), *cert. denied*, 134 S. Ct. 2718 (2014) (internal quotation marks omitted). In this case, the jury found beyond a reasonable doubt that petitioner was guilty of the murder of Lanny Dillard. The evidence was

---

[13] In his reply papers petitioner seeks to avoid the lack of retroactivity of *Alleyne* to collateral proceedings by arguing that he "preserved" the issue at his sentencing and that his counsel therefore could, and should, have raised the issue on direct appeal. But counsel cannot be found unprofessional for failing to raise a claim squarely foreclosed by the 2002 decision of the United States Supreme Court in *Harris*.

uncontroverted that Dillard was shot multiple times; regardless of which Lugo brother actually pulled the trigger, it is clear beyond a reasonable doubt that any rational jury would have found, under either aiding and abetting or *Pinkerton* liability, that Richard Lugo discharged a firearm. As a result, any error under *Alleyne* would not warrant vacating his sentence.

## CONCLUSION

For the reasons discussed above, Lugo's petition for a writ of habeas corpus is DENIED. Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2). The court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this order would not be taken in good faith and therefore *in forma pauperis* relief is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45 (1962).

The Clerk of Court is directed to enter judgment for respondent.

SO ORDERED.

s/Nina Gershon

**NINA GERSHON**
**United States District Judge**

Dated:     Brooklyn, New York
            December 12, 2014